[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.] MEMORANDUM OF DECISION
On December 31, 1997, the Commissioner of the Department of Children and Families (DCF) filed petitions to terminate the parental rights of Carmen M. and Nelson M., the mother and father of Jessica M., born February 23, 1986, Josue M., born August 12, 1987, and Vanessa, M., born August 10, 1988. On the same date, a petition also was filed to terminate the parental rights of Carmen M. and Rene R., the mother and putative father of Angel R., born June 2, 1993. These four siblings had been in foster care for a continuous period of twenty-five months prior to the date the petitions were filed. All of the respondents were duly served and notified of the pendency of the petitions.
On March 26, 1998, Rene R. moved for genetic testing to determine whether or not he was Angel's biological father. The paternity test excluded Rene R. as a possible biological father, and DCF withdrew the grounds of the petition affecting him. No other putative father for Angel was identified by Carmen M.
Nelson M., the father of Vanessa, Jessica and Josue, resides in Florida. He has actual notice of the pendency of these petitions, but has never appeared. Carmen M., mother of all four children, appeared with counsel and indicated her intention to contest the petitions.
Trial commenced on the petitions on September 16, 1998, CT Page 1385 continued on December 4 and was concluded on December 18, 1998.
The petitions allege three statutory grounds for termination of Carmen M.'s and Nelson M.'s parental rights. General Statutes §§ 17a-112(c), in pertinent part, provides for termination if "(A) The child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child;" and "(B) the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding have failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child." The petitions further allege that as of the date of filing, the grounds for termination have existed for not less than one year.
Termination of parental rights proceeds in two stages: adjudication and disposition. In the adjudicatory phase, the court must determine whether the proof provides clear and convincing evidence that any one of the grounds pleaded exists to terminate parental rights as of the date of the filing of the petition or last amendment, and that the ground established has been in existence for at least one year. In re Joshua Z.,26 Conn. App. 58, 63, 597 A.2d 842 (1991), cert. denied221 Conn. 901 (1992). If at least one pleaded ground to terminate is found, the court must then consider whether the facts, as of the last day of trial, establish, by clear and convincing evidence, that termination is in the child's best interest. Procedurally, the evidence as to both issues is heard at the same trial without first determining if the state has proven a statutory ground for adjudication before consideration of the dispositional question.State v. Anonymous, 179 Conn. 155, 172-173, 425 A.2d 939 (1979);In re Juvenile Appeal (84-BC), 194 Conn. 252, 258, 479 A.2d 1204
(1984); In re Nicolina T., 9 Conn. App. 598, 602, 520 A.2d 639, cert. denied, 203 Conn. 804, 525 A.2d 519 (1987); In re EmmanuelM., 43 Conn. Sup. 108, 113, 648 A.2d 904, cert. denied231 Conn. 915, 648 A.2d 151 (1994).
 I
Factual Findings
CT Page 1386
At trial, DCF introduced six documentary exhibits and the testimony of Marta Guzman, a DCF social worker, Elizabeth Tiru, a counselor at the Waterbury Child Guidance Clinic, Luz C., the foster mother of Jessica and Vanessa, and Dr. Nelson Rivera, a licensed psychologist ordered by the court to evaluate Carmen M., the four children and their interaction with their mother and foster mothers. Carmen M. introduced the testimony of her employer, Michael Sawnson. The children's attorney participated fully in the proceedings, but introduced no exhibits or testimony.
The credible and relevant evidence offered at trial supports the finding of the following facts by clear and convincing evidence:
On November 3, 1995, petitions alleging that these four children and another brother, Rene M.,[1] were neglected were filed by DCF, along with motions for orders of temporary custody, which the court granted.
Carmen M. was born in Puerto Rico in 1968 and was raised by her grandmother because her mother physically abused her. She came to Hartford when she was sixteen and met Nelson M., the father of her 3 oldest children. She started using drugs after separating from Nelson and had two other children by two different men.
Nelson M. currently resides in Orlando, Florida. He and Carmen have never divorced. Nelson is terminally ill and unable to care for his children. He has never appeared in this case or contacted the court, but he did communicate to Guzman, the DCF social worker, that he would consent to the termination of his parental rights because he knows the children need a good home. In fact, he signed consent forms which the court declined to accept without the ability to canvas him.
DCF first became involved with Carmen and her five children in 1993, based on allegations that Carmen's admitted addiction to heroin was affecting her ability to care for them. The children had experience multiple changes in residence resulting in educational problems. They lived in overcrowded and substandard living arrangements and were observed to be physically unkept and lacking in personal hygiene and appropriate clothing. There was often a lack of food and adequate furnishings in the family's CT Page 1387 apartment. At times, they were not adequately supervised.
On two occasions, in 1993 and 1994, DCF, in an effort to preserve the family, had Carmen sign service agreements that stipulated she would enroll her children in school and make sure they attended, remain drug free, provide a clean and stable home, cooperate with the Visiting Nurses Association, properly supervise the children, participate in a substance abuse assessment and follow recommendations for treatment. Carmen was warned that if she didn't adhere to the agreement, DCF would file neglect petitions.
Between 1993 and 1995, Carmen moved from place to place with her children, establishing residences in substandard overcrowded apartments littered with drug paraphernalia and lacking basic necessities and utilities. DCF referred her to several drug programs, Cuidate Mujer, Gaylord Hospital and the Hartford Dispensary, which she began but never completed.
The children continued to miss school and medical appointments. With some of them, inattention led to serious dental problems. One worker discovered that Carmen was feeding her infant whole cow's milk rather than formula. Carmen did not cooperate with a parent aide referred by DCF to help the family. After this pattern of neglect continued unabated, DCF finally sought and obtained orders of temporary custody for the five children in November of 1995. Jessica and Vanessa were first placed with their current foster mother, Luz C. in November of 1995. Angel and Josue stayed in one foster home until February of 1996, when they were moved to the home of their current foster mother, Hilda M.
After her children were removed, Carmen appealed in court and was appointed counsel at state expense. Nelson M. requested that his sister, a paternal aunt, Loida R., who resided in Orlando, Florida, be considered as a potential placement for Josue, Jessica and Vanessa. From November, 1995 to the date or the commitments on July 9, 1996, Carmen visited her children only once, on November 16, 1995.
At a case status conference in May of 1996, it was decided that a study of the aunt's home pursuant to the Interstate Compact agreement on foster care should be requested. When the children were adjudicated neglected and committed on July 9, 1996, Carmen did not appear. As a result, she never signed the CT Page 1388 expectations form usually approved by the court at the time of a disposition. During this hearing, the court noted, with Carmen's attorney present, that the placement with the paternal aunt in Florida had been approved.
Shortly after Jessica, Vanessa and Josue were committed, they were moved to Florida by DCF and placed in their paternal aunt's home. Angel remained in Connecticut with Hilda M. In August of 1997, the placement with Loida R. in Florida disrupted and the three older children were returned to Connecticut. Within a few months, Josue was placed back in the home of Hilda M. with Angel, and Jessica and Vanessa were placed back in the home of Luz C.
Guzman had been assigned as treatment worker for the case in September of 1996. Carmen's whereabouts were unknown, but Guzman sent a letter to Carmen's sister's house. Rene M. was adjudicated neglected and his custody transferred to his father, Juan M. in October of 1996, but Carmen did not attend court on that date. Carmen first contacted Guzman in November of 1996, stating she wanted her children back. She was advised that three of the children were with the aunt in Florida. Carmen again dropped out of sight and did not respond to messages and notes Guzman left in her sister's mailbox in late 1996.
Carmen resumed contact with Guzman on June 2, 1997. Guzman met with Carmen in the DCF office and discussed arranging visits with Angel. On June 23, 1997, Guzman paid a home visit to Carmen and told her there was a scheduled hearing on extension petitions on June 26, 1997. Carmen attended court on that date, but the court found efforts at reunification were no longer appropriate and approved a permanency plan for termination of parental rights and adoption. Despite the court's findings, DCF still arranged a visit with Angel for Carmen on July 14, 1997. On July 14, Guzman also provided Carmen with a letter referring her to services for drug rehabilitation and advising her that she could visit with Angel every other Monday as long as she called ahead to confirm she would attend. Carmen was also advised to come to the DCF office if she wanted to telephone the other 3 children in Florida. Carmen then told Guzman she might be pregnant, and Guzman urged her to attend pre-natal visits and stay away from drugs.
Carmen did not contact Guzman again until September 4, 1997, when she inquired as to why the 3 older children were back in Connecticut. She did not ask to see them, and failed to keep an CT Page 1389 appointment with Guzman the following week to discuss the status of her case. In November of 1997, Guzman notified Carmen that Jessica and Vanessa were back with Luz C. and if she wanted to visit with them, she needed to call Guzman.
Carmen's next contact with Guzman was in March of 1998. Guzman advised her that termination petitions had been filed. On March 30, 1998, Carmen refused to sign a release to confirm her claim that she had been attending a drug rehabilitation program at the Institute of Living (IOL) and had remained drug free since February 20, 1998. She said she wanted to show the release to her lawyer. It is not clear from the evidence whether or not this release was provided and there was no evidence introduced at trial that verified any attendance at an IOL program.
Since June of 1998, Carmen has been allowed two visits with her children in the presence of Elizabeth Tiru, a counselor from the Waterbury Child Guidance Clinic. Tiru, who sees the children in play sessions as part of their ongoing therapy, testified that the children at first did not want to see their mother. Before the two visits, they did not mention Carmen in their sessions with Tiru. Tiru states that when the children speak of family, they refer to their respective foster homes.
Angel, Josue and Jessica have exhibited negative behavioral changes after these visits due to mixed signals created by the mishandling of these contacts by DCF and the Child Guidance Clinic. Astonishingly, the Child Guidance Clinic prepared the children for a goodbye, or final visit, with their mother, but Carmen came in and promised them she was buying a house and they would all get back together.
Carmen's only evidence as to her claimed rehabilitation was the testimony of her employer, Swanson. She resides in a single room in his home and he pays her one hundred twenty-five dollars a week to clean and babysit for his two children. He said Carmen had been one of his tenants in a Hartford apartment building he has owned since early 1997, and that she and her family helped him fix up the place. He indicated that he could help Carmen move to a bigger apartment if she got the children returned to her, but acknowledged she would have to get a higher paying job. He knew very little about her past. Although he was aware that she had used drugs, he appeared surprised to learn she had admitted to using as recently as February of 1998. CT Page 1390
Dr. Nelson Rivera, a clinical psychologist, was ordered to conduct individual evaluations of Carmen and the four children. He also evaluated the interaction between the children and Carmen, and the interaction between the children and their foster mothers.
During an extensive interview with Rivera, Carmen admitted using heroin until February of 1998 but insisted she had quit on her own. She admitted to prior hospitalizations for detoxification at the University of Connecticut Health Center and Blue Hills Hospital but could not recall the dates. She claimed to be attending the Cuidate Mujer substance abuse program since about February of 1998. Carmen, noted Rivera in his written evaluation, was:
 ". . . evasive and slightly defensive at times and appeared to minimize the history of her problems. She did have a hypomanic [sic] quality in her interaction in that she often smiles and laughed in a childish manner and responded to some questions in a flipped manner. It was difficult to tell if this behavior was illicited [sic] by drugs or was her natural way of relating to others."
Most significant was her response to personality testing which Rivera found to be invalid since Carmen did not answer questions in a forthright manner. Her response style, according to Rivera, suggest that she tends to portray herself as relatively free of common shortcomings to which most individuals will admit. His clinical profile under represents the extent and degree of any significant findings in all areas due to Carmen's tendency to minimize negative information. In simple terms, she was not honest during this testing. She actually denied any drug abuse, which belies her own admitted history.
Rivera concludes, "Motivation for treatment at this time is poor since she does not admit to problems, is not experiencing distress and sees little need for change in her behavior." He found that she is immature and prone to impulsive decision making and self-defeating behaviors such as substance abuse. Rivera feels Carmen may often approach life in a "lackdasical [sic] and hasty manner, often disregarding social demands and expectations."
In evaluating each of the children, Rivera found all of them to be functioning below average intellectually and exhibiting CT Page 1391 signs of learning disabilities. Jessica appears to struggle with low self-esteem and self confidence and is experiencing sadness and anxiety related to feelings of abandonment and neglect by maternal figures in her life whom she views as unpredictable and inconsistent.
Vanessa feels misunderstood by adult figures in her life, which leads her to feel alienated, frustrated and sad at times.
Josue has been diagnosed with Attention Deficit Disorder and has been treated with Ritalin. Discussion of the custody issues distressed him. Testing revealed that Josue struggles with feelings of inferiority and low self-esteem, fear of rejection and anxious attachment to caretakers in his life.
Angel, too, when tested, revealed struggles with feelings of abandonment and rejection by adult figures in his life. He may externalize feelings of self blame which can lead to acting out misbehavior.
Rivera recommends that all of the children continue with therapy and that their schools be requested to review their current educational plans and perform further educational testing if needed.
Rivera observed a bond between Carmen and her children. However, he also observed an attachment by Josue and Angel toward Hilda M. and an attachment by Vanessa and Jessica to Luz C. His recommendation was that it would be in the best interests of all four children, psychologically and emotionally, to terminate parental rights so the children are viable for adoption by their present foster parents, whom he deemed viable candidates. He notes:
 "Given her minimization, defensiveness in admitting to problems, and her lack of distress at this time as well as her poor history of therapeutic engagement, her prognosis to receive and complete treatment is poor at this time. Although Ms. M. appears to be bonded to her children and her children to her, she does not appear to have come close to meeting court expectations of obtaining housing, drug treatment, or maintaining an adequate visitation with her children despite close to three years of having them in foster care."
 II CT Page 1392 ADJUDICATION
Each statutory basis set out in General Statutes §17a-112(c) is an independent ground for termination. In re BabyGirl B., 224 Conn. 263, 618 A.2d 1 (1992). The petitioner is required to prove one or more of the two grounds alleged in its petition by clear and convincing evidence.
A. Abandonment — C.G.S. § 17a-112(c)(A).
This ground is established when the child has been abandoned by the parent in the sense that the parent has failed to maintain a reasonable degree of interest, concern, or responsibility as to the welfare of the child.
Attempts to achieve contact will a child, telephone calls, the sending of cards and gifts and financial support are indicia of "interest, concern or responsibility." In re Migdalia M.,6 Conn. App. 194, 209, 504 A.2d 533 (1986). There is no evidence that Carmen or Nelson contributed any support to their children since their initial placement in November of 1995. While Nelson does call his three children and send them letters, his decision to move from Connecticut for unexplained reasons and his terminal illness have curtailed his ability to visit with them or do anything to alleviate their plight.
Carmen has no such excuses. Although she provided the children with some gifts during their last few visits, for prolonged periods of time, she had no contact with them. There was one visit between Carmen and her children from November of 1997 to June of 1998. There is no evidence she regularly sent cards, gifts or letters or telephoned the foster homes or DCF to inquire as to her children's well-being. She has yet to accept any responsibility for their welfare and continues to minimize the role she played in fostering their plight.
While Nelson suggested the placement of his three children with his sister, there is no evidence as to what efforts he made in Orlando to help the children adjust to his sister's home. Unfortunately, he has communicated only briefly with DCF and never with the court, leaving the subsequent planning for his children's care to others. The circumstances surrounding his leaving Carmen prior to 1993 are unknown: did he know Carmen was abusing drugs and leave his children with her, or did he leave CT Page 1393 his wife and children and cause Carmen to turn to drugs? Whatever the history, the living conditions of his offspring deteriorated significantly for a prolonged period of time, and there is no evidence he took any steps to rescue them until DCF removed them from their mother.
 "The commonly understood general obligations of parenthood entail these minimum attributes: (1) express love and affection for the child' (2) express personal concern over the health, education and general well-being of the child; (3) the duty to supply the necessary food, clothing and medical care; (4) the duty to provide an adequate domicile; and (5) the duty to furnish social and religious guidance." (Citations omitted; internal quotation marks omitted." In re Kezia M., 33 Conn. App. 12, 17-18, 632 A.2d 1122 (1993); In re Roshawn R., 51 Conn. App. 44, 53, ___ A.2d ___ (1998).
Statutory abandonment on the part of both Carmen and Nelson has been proven by clear and convincing evidence. They have failed to display the minimal attributes of parental obligation. Neither has manifested a consistent, prolonged and reasonable degree of interest, concern or responsibility as to their children's welfare. In re Rayna M., 13 Conn. App. 23, 37-38,534 A.2d 897 (1987); In re Michael M.., 29 Conn. App. 112, 121-123,614 A.2d 832 (1992).
The evidence is clear and convincing that Carmen's and Nelson's abandonment of Jessica, Josue and Vanessa, and Carmen's abandonment of Angel existed for not less than one year prior to the filing of the petitions on December 31, 1997.
B. Failure to Rehabilitate — C.G.S. § 17a-112(c)(B).
If the parents of a child who has been found by the superior court to have been neglected or uncared for in a prior proceeding fail to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, she could assume a responsible position in the life of the child, grounds for termination exist.
The evidence is clear and convincing that Josue, Jessica, Vanessa and Angel were adjudicated neglected and committed to DCF on July 9, 1996. Their commitments were extended on June 26, 1997, when the court found efforts toward reunification with the CT Page 1394 parents were no longer appropriate, and extended again on June 11, 1998.
Personal rehabilitation, as used in the statute, refers to the restoration of the parent to a constructive and useful role as a parent. In re Migdalia M., 6 Conn. App. 194, 203,504 A.2d 532 (1986).
Whether the age and needs of the child do not support allowance of further time for the parent to rehabilitate must also be considered. In re Luis C., 210 Conn. 157, 167,554 A.2d 722 (1989). Also, in determining whether further allowance of a reasonable period of time would promote rehabilitation, a court can consider efforts made since the date of the filing of the petition to terminate parental rights. In re Sarah M.,19 Conn. App. 371, 377, 562 A.2d 566 (1989).
The evidence in this case is clear and convincing that both Carmen and Nelson, as of the date of the filing of the termination petition on December 31, 1997, had not achieved a reasonable degree of rehabilitation, and there is no evidence of conduct prior or subsequent to the date of the filing of the petitions which would encourage the belief that within a reasonable period of time, considering the age and needs of their children, they could assume a responsible position in their lives.
Nelson is terminally ill and has acknowledged to Guzman, the DCF social worker, that he is not going to be able to provide for his children. He admitted to her that adoption would be in their best interests. In fact, he signed and mailed consent forms to DCF. The court does not know much else about Nelson, who never appeared in these proceedings. Even if he were healthy enough to offer a plan for the care of his children, his geographical distance and failure to communicate would warrant disallowing any further reunification efforts.
In light of the children's ages, (three of them are approaching adolescence), the fact that they have been in foster care for over three years, and Carmen's failure to begin any of the recommended rehabilitative efforts, allowing further time for reunification is not reasonable.
A parent's compliance with expectations set after the adjudication of the neglect or uncared for case or the parent's CT Page 1395 success in fulfilling service agreements entered into with DCF are relevant to the rehabilitation finding; while the fulfilling of expectations is not the dispositive issue, it is an important consideration. In re Luis C., supra, 210 Conn. 167-168. The ultimate question is whether the parent at the time of the filing of the termination petition is more able to resume the responsibilities of parenting than she was at the time of the commitment. In re Michael M., supra, 29 Conn. App. 126. DCF has tried to work with Carmen to improve her parenting ability and address her heroin abuse for almost six years. Twice she signed service agreements with which she did not comply. She has rejected or failed to complete any services to which she has been referred. She exposed her children to horrific circumstances undoubtedly fueled by her addiction — a lifestyle that damaged them physically, educationally, and emotionally. She admits no responsibility and expresses no remorse. Incredibly, she has the temerity to argue that she is a good mother because she is now a caretaker for someone else's children. Why did she not expend the effort deemed so commendable by her employer on doing what was required to regain custody of her own children?
The expert testimony of the psychologist, Rivera, supports making no further attempts at reunification with either parent. These children must have permanency now; they have been harmed by recent events which have caused them to anxiously question their future. Rivera noted that the likelihood of Carmen accepting counseling, drug rehabilitation and other rehabilitative programs is poor due to her inability to admit her past deficiencies. Carmen demonstrated a severe lack of parenting ability with her five children prior to their removal, and little commitment to them once they were removed. She admits to abusing drugs until at least February, 1998, and there is no evidence other than her own self-serving statements to DCF that she stopped. She claims to be in programs but there was no evidence introduced at trial to verify this.
As noted previously, Nelson at least faced his shortcomings and acknowledged his inability to rehabilitate so he could parent his children. While Carmen claims to have been trying to improve herself and has become marginally employed, her refusal to find fault with herself and her lack of any treatment or counseling greatly concern the court. It is very doubtful she has conquered her addiction sufficiently or that her rehabilitation to a useful and constructive parental role is probable in a reasonable period of time. CT Page 1396
The evidence is clear and convincing that Carmen and Nelson have not achieved a status where they are more able to parent their children than they were at the time of the children's initial commitment, nor is there any evidence to conclude that rehabilitation to the role of constructive parents could be achieved within a reasonable period of time.
The court believes further delay in this case to attempt to promote more efforts at rehabilitation on the part of either parent would be severely injurious to these children, who are in stable, loving foster homes. All of the children have formed a bond with their foster parents, who wish to adopt them. It is a testament to the commitment of these foster homes that they were willing to take Jessica, Josue and Vanessa back when their relative placement in Florida disrupted. The children deserve a safe, permanent and loving home. They have endured enough.
The second ground alleged for termination as to both Carmen and Nelson has been established by clear and convincing evidence. It is also firmly established, by clear and convincing evidence, that the parents' failure to rehabilitate existed for a period in excess of one year as of the date of the filing of the petitions on December 31, 1997.
 DISPOSITION
1. Section 17a-112(e) Criteria
The court has found by clear and convincing evidence that the statutory grounds alleged by the petitioner for the termination of parental rights as to both respondents have been proven.
Before making a decision whether or not to terminate parental rights, the court must also consider and make findings on each of the seven criteria set forth in Sec. 17a-112(e). In re RomanceM., 229 Conn. 345, 355, 641 A.2d 378 (1994).
These criteria and this court's findings, which have been established by clear and convincing evidence, are as follows:
(1) "The timeliness, nature and extent of services offered or provided to the parent and the child by an agency to facilitate the reunion of the child with the parent." CT Page 1397
On June 26, 1997, the court, after hearing, granted an extension of the children's commitments, finding that further reunification efforts were not appropriate. Prior to that time, DCF offered Nelson M. visitation and telephone contact, and obliged his request for a relative placement near his residence in Florida, which unfortunately did not work out. The state of Florida also offered social work services and counseling to the children.
From 1993 on, DCF offered Carmen services first to preserve the family and then, subsequent to the children's removal in November, 1995, to reunify it. She was offered referrals to several inpatient and outpatient drug treatment programs, the services of a parent aide and the Visiting Nurses Association. Her children were provided with medical care, foster care and counseling. She was offered visitation and, when the three oldest children were in Florida, telephone contact. Even after the court found that further efforts were not appropriate, she was provided with visitation and referrals to drug rehabilitation programs.
The services offered to the parents were appropriate in that they were designed to address the problems that led to the removal of the children. They corresponded to services Carmen had agreed to accept in signed service agreements.
(2) "Whether the Department of Children and Families has made reasonable efforts to reunite the family pursuant to the Federal Child Welfare Act of 1980, as amended."
As noted in paragraph (1) above, DCF made reasonable efforts, to the extent possible, to reunite the family and to encourage placement with relatives when it appeared neither parent was willing or able to work toward reunification. On June 26, 1997, the court found efforts were no longer appropriate.
(3) "The terms of any court order entered into and agreed upon by any individual or agency and the parent, and the extent to which the parties have fulfilled their expectations."
Neither parent ever agreed to a set of expectations. Nelson acknowledged that he could not offer himself as a potential caretaker, but at least he offered a viable plan with his sister in Florida. Carmen M. signed two service agreements prior to the children's removal, in 1993 and 1994, so she knew what DCF expected her to do to preserve her family. On several occasions, CT Page 1398 Carmen also was advised by Guzman what was expected. Carmen never followed through with any services and failed to maintain an acceptable degree of contact with her children or DCF.
(4) "The feelings and emotional ties of the child with respect to his parents, any guardians of his person and any person who has exercised physical care, custody or control of the child for at least one year and with whom the child has developed significant emotional ties."
As Rivera noted, all of the children have an attachment to their mother, but she has not played any major role in their care for three years. Her interaction with them was notably immature. Jessica and Vanessa are bonded to their foster mother, Luz C., and Josue and Angel are bonded to Hilda M. All of the children express a desire to be adopted by their foster parents if their parents' rights are terminated.
(5) "The age of the child."
Jessica is 12, Josue is 11, Vanessa is 10 and Angel is 5. The federal Adoption Assistance and Child Welfare Act of 1980,42 U.S.C. § 670 et. seq., as amended, mandates that after 12 months in foster care a child must have a plan for a permanent home. In re Samantha B., 45 Conn. Sup. 468, 479, ___ A.2d ___
(1998). Foster care should be a strictly limited episode in the life of a child. These four children have been in foster care for over three years. All of them except Angel have endured disrupted prior placements. They deserve a permanent home without further delay.
(6) "The effort the parent has made to adjust his circumstances, conduct or conditions to make it in the best interest of the child to return to his home in the foreseeable future including but not limited to (A) the extent to which the parent has maintained contact with the child as part of an effort to reunite the child with the parent provided that the court may give weight to incidental visitations, communications or contributions and (b) the maintenance of regular contact or communications with the guardian or other custodian of the child."
Nelson did attempt to maintain a degree of contact with his children, and even helped to bring them to a relative placement in Florida, which, regrettably, did not last. He has been CT Page 1399 forthcoming in his willingness to admit that his terminal illness prevents him from offering a plan for the children's permanency. Carmen failed to conform her conduct to even minimally acceptable standards. She did not maintain regular contact or communications with DCF, her children or their caretakers for many months after their removal. Until June of 1998, she had visited Angel only a handful of times and the other children only once.
(7) "The extent to which a parent has been prevented from maintaining a meaningful relationship by the unreasonable acts or conduct of the other parent of the child, or the unreasonable act of any other person or by the economic circumstances of the parent."
There is no evidence that indicates that DCF or any other person interfered with either parents' ability to maintain a relationship with their children by unreasonable acts or conduct. In fact, in this court's opinion, DCF tolerated mother's serious neglect of her children for far too long before they took steps to remove and protect them. There is no evidence that economic circumstances have constituted a significant factor in the parents' failure to maintain a meaningful relationship with them. It should be noted that Carmen was provided with an attorney at state expense throughout all of the proceedings affecting her children.
2. Best Interests of the Children
The court must now address the issue of whether the termination of parental rights is in the best interests of the children. This is the dispositional phase of a termination proceeding. In re Valerie D., supra, 223 Conn. 511.
Nelson has admitted to DCF that he cannot provide a home for his children and he feels adoption is in their best interests. As of the date of trial, Carmen had not procured a suitable home or sufficient income to support herself or her children. She has not sought adequate treatment or any counseling for her parenting deficiencies and drug addiction. Her minimal employment over the past year is insufficient evidence that she had improved in, or even addressed, the problems of most concern. It is highly unlikely that she will be in a position, in a reasonable period of time, to parent her children. Her employer may respect her, but it was clear he had not been told the whole story. Carmen, noted Rivera, the psychologist, can't even admit the truth to CT Page 1400 herself.
Rivera determined all of these children have special needs and require counseling. The foster parents have been cooperative in addressing these needs. Carmen told Rivera she didn't see why her children needed any special help, a glaring illustration of the extent of her denial. Despite Rivera's concerns, all four children are not as maladjusted as one might expect, and this is a tribute to the loving foster care they have been receiving. Based upon the foregoing findings, and having considered all the exhibits and testimony, the court concludes that the evidence is clear and convincing that the best interests of Jessica, Vanessa, Josue and Angel are served by the termination of parental rights so they may be free for immediate adoption. The court notes that counsel for the child fully supports this result as being in the best interests of the children so that they can be provided with a permanent and stable home as soon as possible.
 CONCLUSION
The petitions are granted and judgment may enter terminating the parental rights of Carmen M. and Nelson M. on the grounds of abandonment and failure to rehabilitate.
Pursuant to General Statutes Sec. 17a-112(i), it is ordered that the commissioner of DCF be appointed statutory parent so that Vanessa, Jessica, and Josue M. and Angel R. can be placed for adoption. It is the court's directive that the children's current foster families be given first consideration as adoptive homes. The statutory parent shall report to the court within ninety days on a case plan for the children. A review plan for each child shall be filed in accordance with state and federal law until such time as adoptions are finalized.
_________________ KELLER, J.